Filed 10/31/22  P. v. Thornton CA1/2
Order modifying opinion filed 10/26/22

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>MARVIN DOUGLAS JOHNSON,<br><br>      Defendant and Appellant. | A160581<br><br>(Mendocino County Super. Ct.<br>No. SCUK CRCR 11-18259) |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>SIMON THORNTON,<br><br>      Defendant and Appellant. | A160566<br><br>(Mendocino County Super. Ct.<br>No. SCUK CRCR 11-18259)<br>ORDER MODIFYING OPINION |

BY THE COURT:

It is ordered that the opinion filed herein on October 26, 2022, be modified as follows:

In the last line of text on page 43, replace the word "Johnson's" with "Thornton's." The sentence should now read: "We therefore reverse the order denying Thornton's petition for resentencing under S.B. 1437."

1

This modification does not change the judgment.


Dated :_____                    _____
                                                     Richman, Acting P.J.


A160581, *People v. Johnson*; A160566, *People v. Thornton*

Filed 10/26/22  P. v. Thornton CA1/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARVIN DOUGLAS JOHNSON,<br><br>        Defendant and Appellant. | A160581<br><br>(Mendocino County Super. Ct. No. SCUK CRCR 11-18259) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SIMON THORNTON,<br><br>        Defendant and Appellant. | A160566<br><br>(Mendocino County Super. Ct. No. SCUK CRCR 11-18259) |

In 2018, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (S.B. 1437) " 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, [and] was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*), quoting Stats. 2018, ch. 1015, § 1, subd. (f).)  Effective January 1, 2019, the new law narrowed the felony murder rule significantly for defendants who were not actual killers and eliminated second degree murder

1

liability based on the natural and probable consequences doctrine. (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*); Pen. Code,[1] §§ 188, subd. (a)(3), 189, subd. (e); *People v. Gentile* (2020) 10 Cal.5th 830, 841–843 (*Gentile*).) It also provided a resentencing procedure for those convicted of murder under the former law to have their convictions set aside if they could not be convicted of murder under the law as amended by S.B. 1437. (*Lewis*, at p. 959; see § 1172.6.)

Years before S.B. 1437 was enacted, a jury convicted Marvin Douglas Johnson and Simon Thornton (together, defendants) of first degree murder, though it was undisputed neither was the actual killer, and subsequently their convictions were reduced to second degree murder after direct appeals. (See *People v. Johnson* (2016) 243 Cal.App.4th 1247, 1251–1252 (*Johnson*).)

In 2019, Johnson and Thornton each petitioned for resentencing under S.B. 1437.[2] After an evidentiary hearing, the trial court denied their petitions, finding that each defendant was a major participant in an attempted armed robbery and acted with reckless indifference to human life and that they were thus guilty of first degree felony murder under current law (see § 189, subd. (e)(3)).

Johnson and Thornton appeal. We conclude there is no substantial evidence supporting the trial court's findings that defendants acted with reckless indifference to human life and, therefore, reverse the orders denying defendants' petitions for resentencing.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] The resentencing procedure was originally codified as section 1170.95 and that is the provision the parties cite in their appellate briefing. Effective June 30, 2022, the provision has been renumbered section 1172.6 without substantive change. (*Strong*, *supra*, 13 Cal.5th at p. 708, fn. 2.)

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Defendants' Joint Criminal Trial*

1.    <u>The Shooting and the Criminal Charges</u>

As we summarized in our opinion on direct appeal, "On July 20, 2011, a car sped into a campsite at Lake Mendocino at about 60 miles an hour and skidded to a stop.  Four men got out of the car: defendant Marvin Douglas Johnson, defendant Simon Thornton, AJ Schnebly and William (Buck) Crocker.  Crocker, wearing a red bandana that covered his face from the nose down, ran towards the group at the campsite, and with a gun in his hand, shouted for everybody to get down on the ground.  Within minutes, Joe Litteral, who had been staying at the campsite, was shot to death and Brandon Haggett, another visitor, was shot and seriously wounded." (*Johnson, supra*, 243 Cal.App.4th at p. 1251).

Johnson and Thornton were jointly tried on three counts: murder, attempted murder, and attempted kidnapping.  At trial, it was undisputed that Johnson and Thornton were not the shooters.  The prosecution proceeded under two theories of murder liability that are no longer valid: first degree felony murder *without* proof that defendants either acted with intent to kill or were major participants in the underlying felony who acted with reckless indifference to human life, and second degree murder based on the natural and probable consequences doctrine.  The prosecution relied on attempted robbery and attempted kidnapping as the underlying felonies.

2.    <u>Prosecution Evidence</u>

Deborah Cano testified that, in July 2011, she was married to Johnson and they "were homeless and living on the 'outside' in a field in a tent in Mendocino County.  They had a 12-year, troubled relationship that Cano described as 'ups and downs, abusive, controlling.'  Johnson hit, beat and

3

threatened her on many occasions and was also verbally and emotionally abusive. She was afraid of Johnson and many times tried to leave him. When she left he would send people to find her, or he would look for her himself. . . .” (*Johnson, supra,* 243 Cal.App.4th at p. 1252.)

"In July 2011, Cano decided to get away from [Johnson]. Initially, she went to AJ Schnebly's house. She didn't stay with Schnebly, however, because he was Johnson's friend and that made her feel unsafe. She 'took off walking' until she ran into Joe Litteral, who was also homeless. . . . [¶] Litteral offered to take Cano to the Pine Cone Motel where he had a room. A lot of people were in and out of the motel, and three or four people spent the night in Litteral's room. Cano did not leave the room because she did not feel safe. After she arrived, Johnson sent Schnebly and two other people to check on her.

"The next day Cano, still at the Pine Cone Motel, overheard Johnson and a friend of Litteral's named Brandon Haggett on the phone. Johnson was yelling at Haggett and she overheard Johnson saying, 'I am going to kill you. I am going to come there and I am going to kill you.' . . .

"Cano and the other people who were staying with her and Litteral at the Pine Cone Motel decided to go to the Bu-Shay campground at Lake Mendocino. Cano estimated that there were at least nine people at the campground, including two children. Brandon Haggett and Joe Litteral were among this group.

"The day after they arrived, Johnson came up over the ridge 'yelling and screaming.' He sent two or three people into the campground ahead of him. Cano did not know them by name, but was familiar with them. Cano did not speak with Johnson directly. Instead, she went inside her tent.

4

Johnson stayed at the campsite into the evening hours eating, talking, smoking marijuana and drinking with, among others, Litteral and Haggett.

"Toward the end of the evening, Johnson approached her. He said things like 'I am going to get you. I am going to get you back. I know I am going to get you, and you better watch what you are doing. You better not have them do anything, and if I see you doing anything, I'm going to hurt somebody.' Cano testified that Johnson said 'if he seen me with Joe Litteral' in a romantic way 'he was going to hurt us.' After Johnson left, Litteral told her that she should stay in the tent with him because 'we're not going to let nobody scare us.'

"Johnson went to the campsite next to theirs, where six or seven other people were staying. He stayed the night. The next morning he was back at Cano's campsite 'talking with all the guys.'

"On July 20, as it was becoming evening, a car pulled up 'really quick' to the tent where Cano was staying. The doors flew open. The first person Cano recognized was AJ Schnebly, who had a pistol grip shotgun in his hands. Cano did not see anything in Johnson's hands. Schnebly racked the shotgun. Moments later, Cano saw Brandon Haggett 'fighting with a guy with a handgun.' This man (later identified as Crocker) was wearing a bandana over his nose and mouth. Cano heard a gunshot and saw Haggett drop to his knees.

"Litteral, who was about 55 feet away, ran toward Haggett. Cano saw the man with the gun 'shoot him, point blank.' She heard a second shot, and testified 'I seen Joe [Litteral] go down. . . . I screamed, and I started running over there . . . .' At that point, Johnson ran toward her and grabbed at her. As he did so he yelled, 'Get in the fucking car, bitch.' She ran the other way

5

towards Haggett and Litteral." (*Johnson*, *supra*, 243 Cal.App.4th at pp. 1252–1254.)

"Brandon Haggett, one of the shooting victims, testified about the days that led up to the incident and the shooting itself. In July 2011, Haggett was staying at the Pine Cone Motel with his friend Joe Litteral. Cano came to stay at the motel. Over the course of Cano's first day at the motel, Haggett answered five or six calls from a man who identified himself as Cano's husband. This man, who Haggett later learned was Johnson, told Haggett, 'I want her back,' '[b]etter bring my wife back. I am going to kill you. I am going to find you.' . . . All of the conversations he had with Johnson contained threats of some kind, including threats to kill.

"At several points, Cano spoke with Johnson on the phone. Haggett heard her yelling at Johnson, and at one point she agreed to meet Johnson to see if they could work things out. [¶] Haggett didn't take Johnson's threats seriously because 'people threaten people all the time when they are hurt. They never act on it.' But because the calls were creating 'a lot of strain' among the people at the motel, they decided to leave and go to a campground at Lake Mendocino.

"A day after they arrived at the campground, Johnson showed up with three other people. He was yelling at his wife, and she was yelling back at him. Haggett told him 'if you are looking for a fight, I am going to stop you right here because you are not bringing this into the campground.' Johnson and his friends accepted Haggett's invitation to stay to eat, drink beer and smoke marijuana.

"The next day, July 20, 2011, at around dinner time, a car came speeding into the campground about 60 miles an hour. The car skidded about five feet before it stopped. Four doors swung open, and four men came out.

6

One had a shotgun and one had a .45.  Johnson came out of the right hand passenger side rear door.  Haggett did not see who came out of the driver's side.

"The man with the shotgun (Schnebly) stood by the car.  The man with the .45 (later identified as Crocker) was moving toward the campground.  He was running fast, and wore a wig and a red bandana that covered his face.  There were about 15 or 20 people at the campground.  Crocker pointed the gun in the air and then moved it around in a circle toward the people at the campground and yelled '[e]verybody down on the ground.'  At the same time, Johnson was yelling at Cano, ' "See what we can do? Get in the car." '

"Haggett told one of the women at the campsite to ' "[g]et the kids out of here." '  Haggett then 'made a split decision to protect the girls and [Litteral's] life.'  He ran up to Crocker, grabbed Crocker's gun, put it to his own chest and told Crocker 'to pull the trigger a couple of times.'  When Crocker did not pull the trigger, Haggett started fighting with him over the gun.  In the struggle over the gun, Crocker dropped to the ground on his back.  Haggett was on top of him, and it felt like Crocker was losing his grip on the handgun.

"At that point, Haggett felt three 'severe blows' to the back of his head.  It sounded like metal hitting a rock.  Haggett turned around to face the person who was hitting him.  He identified that person at trial as Thornton.  As Haggett pulled back his fist to hit Thornton, Haggett was shot point blank in the chest by Crocker.

"Haggett tried to get up and saw Litteral start fighting with Thornton.  Crocker ran toward the car and then 'turn[ed] back around and start[ed] firing in Joe [Litteral]'s direction.'  Haggett heard three shots.

"Litteral dropped to his knees, and Haggett heard him yelling, ' "Oh shit. I am dead." ' All the men ran toward the car. Johnson was by the car and yelled to Cano to get into the car again. During the entire incident, Johnson stayed by the car. When the men got in the car, Cano was over where Litteral had fallen and Johnson 'made no attempt to make sure he got Deborah to leave . . . .' " (*Johnson*, *supra*, 243 Cal.App.4th at pp. 1254–1255, fns. omitted.)

Evidence showed "Litteral bled to death from a gunshot wound that perforated his right lung. His right arm was fractured by a blow with such significant force that there was a tremendous amount of hemorrhage around the broken bone. The forensic pathologist believed the bone was fractured by something round and wooden that could create this amount of force and type of injury, such as a baseball bat or a bowling pin. Haggett was shot in the left arm and is now unable to extend his fingers or move his wrist on that arm.

"Schnebly's nephew, Kenny Kumpula, testified that after the shooting, Thornton told him that he had gone to Lake Mendocino with Schnebly and Crocker '[o]ver some money and a woman[,]' and 'to beat some people up[.]' Thornton also told Kumpula that 'people at the lake owed him money[.]' "

"Defendant Johnson gave several interviews to the police, substantial portions of which were played for the jury. Johnson admitted he drove Schnebly, Crocker and another person to and from the [campsite] where the shootings took place. He told the police that he had told 'AJ and those guys' that there was 'weed and cash' at the campground, and that while at 'the creek' in Willits the morning of the shootings he knew that they were 'going out there to rob these mother fuckers[.]' . . . 'I thought they were going out there to argue and fight maybe and try to get their money or whatever but

8

not like that.'  At another point he explained that everybody was 'out there for the money and the weed that's out there.'  He also admitted that he saw Schnebly's and Crocker's guns before they arrived at the campsite.  Johnson told the police that when he was driving the men to the campsite immediately before the shootings, he 'knew they were driving out there to go rob some people.'  Johnson related that the others told him 'you're just going for the lady.  We're getting all the money.'

"After he was arrested, Johnson took the police to the place in Potter Valley where the guns had been dumped after the shootings.  He told them a bat was there too, but no bat was recovered."  (*Johnson, supra,* 243 Cal.App.4th at pp. 1255–1256.)

In a recorded phone call from jail, "Thornton spoke to 'Justin,' and told him that 'there's some things out I need to get, make sure that are disposed of.' . . . (When Thornton testified at trial, he admitted he was talking about the guns used at the incident.)  In another recorded phone call, Thornton told his fiancé[e] Tanya Thurman to tell Schnebly that 'we got rid of' the thing that Thornton 'wanted to get from [Schnebly],' and told her to '[t]ell [Schnebly] all of that, nothing to worry about unless somebody that was with us says something.'  Apparently referring to Kenny Kumpula (Schnebly's nephew and Thurman's friend, and the person whose car was borrowed so the entourage could drive to the lake on the day of the shootings), Thurman told Thornton that Kumpula 'wants to know why he got lied to by his uncle and you and that he doesn't care and that anyone who lies to him is dead to him.'  Thornton replied, 'We did it to protect him because if he knew what was really going on, it could be bad for him.  And it wasn't planned to go the way it went.' "  (*Johnson, supra,* 243 Cal.App.4th at p. 1256.)  In another call, Thornton asked Thurman "to tell Kumpula that a 'good soldier' 'follows

9

orders.'  Thornton told Thurman to tell Kumpula that he 'was looking at the bigger picture.  I was looking at making our life more comfortable.  All of ours.' " (*Id.* at p. 1257.)

3.    Johnson's Defense

Testifying in his own defense, Johnson denied he intended to aid a robbery.  (*Johnson, supra,* 243 Cal.App.4th at p. 1265.)

Describing his relationship with Cano, Johnson corroborated her testimony that she left him in July 2011.  Johnson knew Cano was staying with Litteral and Haggett at the Pine Cone Motel, and he testified he both went to the motel to talk to her and called her there.  (*Johnson, supra,* 243 Cal.App.4th at p. 1260.)

"The next time Johnson saw Cano was at Lake Mendocino.  He went there to 'talk to my wife and maybe she was going to come back with me.  I'm not sure.  I wasn't going to make her.'  At first, the conversation was 'heated' but ultimately, . . . Litteral . . . invited him into the campsite.  He was familiar with Litteral from running into him in Willits.  Litteral told Johnson that he thought Cano needed some time away from him. . . .

"Johnson . . . was 'kind of hurt but I wasn't going to bust a grape over it.'  He decided to continue trying to talk to Cano about it, so he stayed overnight at the next campsite.  He heard Cano crying in the tent she was sharing with Litteral.  He understood she was crying because she didn't want him to be there.  He also felt that she was trying to make people feel sorry for her.  He did not go to her tent to talk to her that evening.

"At the end of the evening, someone asked Johnson if he could help them get some marijuana.  Johnson talked to someone at another campsite and made a deal with a man named Brackett whereby Johnson would receive $100 for every pound that was bought. . . .

10

"The next morning, July 20, Johnson introduced Brackett to Litteral and a man named River to set up the marijuana deal. Johnson then left the campground and went back to Willits. He met Crocker and some other men 'at the creek.' At some point Schnebly showed up. The men were talking, 'smoking some pot, drinking some whisky, some beer.' After Schnebly said he was going to Lake Mendocino with some girls, Johnson told him that 'Well, okay if you guys go up there, ask them if a weed deal went through because they owe me a couple hundred bucks.' When Schnebly asked him to elaborate, Johnson told him there might be 'weed and money' up there. Johnson admitted he was 'drinking so I kind of, you know, blabbed a lot to him;' he was 'running [his] mouth, . . . [¶] . . . talking big talk.' Johnson bragged that he had set up a big marijuana deal." (*Johnson, supra,* 243 Cal.App.4th at pp. 1260–1261.)

Later that day, Schnebly asked Johnson if he had a driver's license because he wanted Johnson to drive them (apparently referring to Crocker, Schnebly, and Thornton, who had joined them) out to the lake. "Johnson said he was not sure. . . . They approached him again and asked him to give them a ride. His response was '[w]ell, I guess, I could try see if my wife's ready to go home yet or not.' . . . (*Johnson, supra,* 243 Cal.App.4th at p. 1261.) Schnebly's nephew Kumpula loaned Johnson the car because he had a driver's license. Johnson claimed that his intention at that point "was to give the three men a ride to the campsite. He knew they wanted 'to do something' but he 'wasn't really sure what . . . they wanted to do. Little bits and pieces were coming out but not all at once.' He described the men in the car as 'talking amongst themselves like back and forth mumbling and stuff like that, what was going to be going on. But I mean, I had a little inkling of what was kind of going to go on, they were going to handle something, but

not for sure exactly what until we got there and everything went bad.' Thornton was involved in this conversation '[b]ut not really as much as [Crocker].' [¶] Johnson testified that he might have heard about a handgun before they went to Crocker's trailer in Willits. Crocker got out of the car, went into his trailer and got back in with a duffel bag. Johnson was 'getting a little suspicious here and there off of some things that were being said. . . .' Johnson attributed his inability to remember some of the details of these events to being 'a little bit drunk' that day." (*Johnson, supra,* 243 Cal.App.4th at p. 1262.)

"When Johnson was asked why he changed his mind and agreed to drive to the campsite, he said he 'was thinking on what they were going to be doing and my wife was out there I didn't want her to get hurt or whatnot.' He changed his mind because of '[t]heir actions, the way they were talking.' The 'bits and pieces' he was hearing included 'talk about going out there and handling some business, coming up.' To him 'handling some business' meant 'they want to go out there [and] take whatever they were getting that I set them up with.' He admitted he understood that 'they were going to go out and take the stuff [he] had bragged to them about that might be up there." (*Johnson, supra,* 243 Cal.App.4th at p. 1262.) Johnson "was worried when they were talking about 'robbing,' and Crocker came out [of his trailer] with some bags." (*Id.* at p. 1263.)

"Before they arrived at the campground, Johnson pulled off the road and stopped the car. Thornton got out and took the duffel bag out of the trunk. He handed it to Schnebly and then got back in the car. Schnebly unzipped the duffel bag and started piecing together a shotgun sitting right next to Johnson in the front seat. Johnson asked him what he was doing, but still continued driving. Johnson [testified that he] did not get out of the car

12

and leave because he was 'kind of freaked out . . . I don't mess with guns.' This was the first time Johnson realized there was a shotgun inside the bag. At that point he knew 'what we're going to be doing,' but [he claimed at trial that] he did not want any part of it.

"Johnson continued to drive through the guard gate to the campground. He told the guard he was dropping off some supplies. A short way beyond that, he stopped the car again. Crocker and Schnebly put on bandanas. Crocker also unzipped his bag and put a magazine into his gun. Johnson saw people putting clips in guns and racking a round into the shotgun.

"Crocker and Schnebly told him to drive up to the campsite. Johnson agreed but 'I was real hesitant on what I was wanting to do because I was just stunned.' He described himself as being a little scared and a little anxious. But he knew 'exactly [what] was going on at that point.' He knew they were going to use the guns and maybe commit a robbery. And he kept driving them into the campground. (*Johnson*, *supra*, 243 Cal.App.4th at p. 1263.)

According to Johnson, he drove the car at a normal speed to the site where his wife was staying. (*Johnson*, *supra*, 243 Cal.App.4th at p. 1263.) He testified that "Schnebly opened his door first, pulled out the shotgun, cocked it and said ' "Everybody on the ground." ' Crocker got out of his seat behind Schnebly and 'with his handgun out . . . he started pointing it at people as he was walking.' Crocker told everyone to get on the ground as well. [¶] Johnson 'got out of the car and . . . was standing with one leg in, one leg out, and was holding the door . . . I was yelling "what the fuck? What the fuck?" ' He yelled out to Cano, 'get—get fucking over here and get in the fucking car.' It was his intention to take Cano away as quickly as possible." (*Id*. at p. 1264.)

13

Johnson testified that "Thornton was still in the car. He got out when '[Schnebly] asked [him] to get out of the car and go help [Crocker] while [Crocker] was . . . getting jumped . . . .' 'Haggett was hitting [Crocker] in the face with his fist. And Joe [Litteral] took off running with a log in his hand, going, "Ahh," like that, going toward them and then Joe started hitting [Crocker] and he hit him right across the bridge of his nose with a stick. . . . [¶] And then [Schnebly] tells [Thornton] to get out of the car and go help [Crocker]. So [Thornton] got out of the car with the baseball bat, went over there and he starts swinging on Mr. Haggett and then Mr. Litteral got hit in the arm. . . . [¶] . . . That's how the log got dropped . . . [Litteral] had the log in the arm that he was swinging with and when he got hit in the arm the log fell.' Johnson recalled that the bat was a beat up aluminum bat with a black piece on the handle." (*Johnson*, *supra*, 243 Cal.App.4th at p. 1264.)

Johnson testified he "was 'yelling a lot of shit out. . . . everything went so fast . . . .' His main concern was with his wife. He testified he did not leave the car and get her, however. He knew she wouldn't go with him 'especially after the gun got fired.' The gun was fired after '[Litteral] hit [Crocker] in the face with the log and [Crocker] went down and he was on his knee when he was pointing upward . . . .' Johnson heard the gun go off two times. Haggett 'was probably on one knee from getting hit with the baseball bat.' Crocker got up and Johnson 'heard the gun go off . . . as [Crocker] was running away from them.' Johnson thought Crocker was going to fire the gun again, but Schnebly told him to stop. Johnson restarted the car and drove off with Thornton, Schnebly and Crocker." (*Johnson*, *supra*, 243 Cal.App.4th at p. 1264.) "On the way back to town, Thornton said, ' "I cracked him a couple of times." ' Johnson recalled that the bat was in Kenny Kumpula's car when

14

they began driving and that Thornton had possession of it '[l]ike it was his weapon.' " (*Id*. at p. 1264, fn. 7.)

"All the way back to Lake County, Crocker and Schnebly argued about where they were going to hide out. Johnson took them to Potter Valley and told them where to put the guns. . . . [¶] Schnebly and Crocker put the guns in the bushes and Thornton threw the bat 'deep into the bushes on the driver's side of the car. . . .' Johnson was dropped off in Ukiah. He told them 'You guys are on your own. I'm not hiding from nobody. I'm going to walk right down the street. I didn't do nothing.' . . .

"Johnson was arrested the next day. He testified that in his interviews with the police he began by minimizing his involvement altogether because he was worried about 'snitching' and what would happen to him and his family. Ultimately, however, he claimed he told the police the truth about what happened. (*Johnson*, *supra*, 243 Cal.App.4th at pp. 1264–1265.)

"Johnson also testified that while he was in jail he had an altercation with Thornton in which Thornton told him he was a 'fucking snitch' and that he (Thornton) was going to 'fucking kill you.' This was not the first time Thornton had threatened him." (*Johnson*, *supra*, 243 Cal.App.4th at p. 1265.)

4.    Thornton's Defense

Thornton testified in his own defense. He met Crocker for the first time on the day of the shooting, he had met Johnson once or twice before, and he had only known Schnebly for about a week and a half. (*Johnson*, *supra*, 243 Cal.App.4th at p. 1258.) Thornton admitted that he was in the car with Johnson, Crocker, and Schnebly on July 20 when they drove to the campground, but he claimed he thought they were going to pick up Johnson's wife and he " 'was just going along for a ride.' " (*Id*. at pp. 1258–1259.) Thornton testified that "Schnebly called Kenny Kumpula to use his car, and

15

soon the four men got into the car and left town.  Johnson drove.  On the way, Crocker 'wanted to stop by the place where he was staying to grab a backpack. So we did that. . . . [H]e came out with a green . . . Jansport backpack, it might have been a duffel bag.'  Crocker put the backpack into the trunk of the car."  (*Id*. at p. 1257.)  They drove into the campground, and Thornton saw Crocker put a mask over his face and Schnebly " 'start assembling what looked like a shotgun,' " and Crocker also had a gun with some clips and ammunition.  (*Id*. at p. 1258.)

Thornton testified, " 'At one point they stopped.  [Schnebly] opens the door to [the] passenger front seat and gets out with the shotgun across his body. . . .  As he's doing that, [Crocker] got out behind him. . . .' " (*Johnson*, *supra*, 243 Cal.App.4th at p. 1258.)  Thornton testified he was " 'freaking out' "; he denied he ever left the car during the attempted robbery and denied he carried a baseball bat.  (*Id*. at pp. 1258–1259.)

According to Thornton, "Crocker and Schnebly got into the car, and they all left.  There was an argument in the car about where to go next.  Johnson wanted to get out of the car and leave, as did Thornton.  Thornton did not say anything.  They went to Potter Valley to drop off the guns, and then on to Ukiah. . . . Johnson said, 'I had nothing to do with this. I didn't have no reason to be involved in this.  I didn't touch no gun, my hands are clean. . . .' Johnson got out of the car.  Schnebly and Crocker had an argument about who would drive the car, and Thornton volunteered to take it back to Willits.  On the way, Schnebly and Crocker threatened Thornton that if he said anything they would hurt him and his fiancé[e], who was pregnant at the time."  (*Johnson*, *supra*, 243 Cal.App.4th at p. 1259.)

16

5.    <u>Jury Verdicts</u>

Johnson and Thornton were convicted of first degree murder and attempted murder. The jury also found true firearm use allegations that a principal in the crime was armed (§ 12022, subd. (d)) as to both charges. The jury found both defendants not guilty of attempted kidnapping. Thornton also was charged with personally using a deadly and dangerous weapon, "to wit, bat" (§ 12022, subd. (b)(1)), as an enhancement to each of the counts, but the jury did not reach a unanimous finding on the bat-use allegations, and these allegations were later dismissed.

B.    *Direct Appeals*

Defendants appealed, and this court concluded the trial court erred in instructing the jury it did not have to unanimously agree on a theory of murder where one of the theories was for murder in the first degree (felony murder under section 189) and the other was for murder in the second degree (natural and probable consequences liability). Finding the error prejudicial, we conditionally reversed the first degree murder convictions and remanded the matters to allow the prosecutor to elect whether to retry defendants or accept second degree murder convictions. (*Johnson*, *supra*, 243 Cal.App.4th at pp. 1251–1252.) The California Supreme Court then granted defendants' petitions for review and transferred the cases back to this court with directions to vacate our prior opinion and reconsider in light of the then-recently issued opinion *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*). On reconsideration, we concluded *Banks* did not apply to the issues raised and no change in the disposition of the appeals was necessary. (*Johnson*, at p. 1252.)

In November 2016, the prosecution opted not to retry defendants, who now stand convicted of second degree murder. Johnson was sentenced to

17

state prison for 15 years to life, plus seven years, and Thornton was sentenced to 15 years to life, plus nine years.

C.  *Petitions for Resentencing*

In 2019, Johnson and Thornton each petitioned for resentencing under former section 1170.95.  (See fn. 2, above.)  As to each petition, the trial court found defendant made a prima facie case for relief and issued an order to show cause.  Opposing the petitions, the prosecution argued Johnson and Thornton were still guilty of murder under the law as amended by S.B. 1437 because the trial evidence showed they were both major participants who acted with reckless indifference to human life.

At a joint evidentiary hearing on the petitions, the parties elected not to present additional evidence and relied on the original trial record.  The trial court denied the petitions, finding each defendant was a major participant in an attempted armed robbery who acted with reckless indifference to human life.

## DISCUSSION

A.  *Senate Bill No. 1437*

We begin by considering in more detail the changes S.B. 1437 made to the law of murder.  Now, as before S.B. 1437 was enacted, murder requires "malice aforethought" (§ 187, subd. (a)); section 188 provides that malice may be express or implied and describes each type of malice (§ 188, subd. (a)(1) and (2)); and section 189 specifies the circumstances under which murder is in the first degree and provides that all other murders are of the second degree (§ 189, subds. (a) and (b)).

1.  Murder Liability Before S.B. 1437

Under the felony murder rule before S.B. 1437, a defendant who aided and abetted an inherently dangerous felony offense could be liable for murder

if an accomplice killed someone during the commission or attempted commission of the offense; the murder would be in the first degree if the underlying offense was listed in section 189 (including robbery and kidnapping). (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654.)

Under the natural and probable consequences doctrine before S.B. 1437, a defendant who aided and abetted a crime could be liable for second degree murder if an accomplice committed murder, and the murder was a natural and probable consequence of the crime aided and abetted. (Cf. *Gentile*, *supra*, 10 Cal.5th at pp. 838–839 [describing the natural and probable consequences doctrine and holding that S.B. 1437 eliminated second degree murder liability under the doctrine].)

Under both the felony murder rule and the natural and probable consequences doctrine, the malice required for murder was imputed based on the defendant's participation in a crime that resulted in death. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1184 [under the felony murder rule, malice was not irrelevant, the rule "simply describe[d] a different form of malice under section 188"; malice was imputed " 'to those who commit[ted] a homicide during the perpetration of a felony inherently dangerous to life' "]; *Gentile*, *supra*, 10 Cal.5th at p. 847 [the natural and probable consequences doctrine allowed "a factfinder to impute malice 'to a person based solely on his or her participation in a crime' "].)

2.     S.B. 1437's Changes to Murder Liability

S.B. 1437 added subdivision (a)(3) to section 188, which provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. *Malice shall not be imputed to a person based solely on his or her participation in a crime.*" (Stats. 2018, ch. 1015, § 2, italics added.) Thus, second degree

19

murder liability based on the natural and probable consequence doctrine was eliminated.  (*Gentile, supra,* 10 Cal.5th at pp. 842–843.)

S.B. 1437 amended the law on first degree felony murder found in section 189, adding (among other things) subdivision (e), which now provides: "A participant in the perpetration or attempted perpetration of a [listed] felony [including robbery] . . . in which a death occurs is liable for murder only if one of the following is proven:

"(1) The person was the actual killer.

"(2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

"(3) The person was a *major participant in the underlying felony* and *acted with reckless indifference to human life*, as described in subdivision (d) of Section 190.2."  (§ 189, subd. (e), italics added; see Stats. 2018, ch. 1015, § 3.)

Section 190.2, in turn, lists the special circumstances that require a sentence of death or life in prison without the possibility of parole.  Thus, "only defendants who are also death eligible under section 190.2 may now be convicted of felony murder in the first place."  (*People v. Cooper* (2022) 77 Cal.App.5th 393, 411 (*Cooper*).

3.      Petitioning for Resentencing

As we have mentioned, S.B. 1437 included a procedural mechanism for defendants convicted of murder under the old law to obtain resentencing if they could not be convicted of murder under the law as amended by S.B. 1437.  (*Lewis, supra,* 11 Cal.5th at p. 959; see § 1172.6.)

Our high court recently described the resentencing petition process: "When the trial court receives a petition containing the necessary declaration

20

and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' (§ 1172.6, subd. (c); [citation].) If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. (See § 1172.6, subd. (c); [citation].) If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' (§ 1172.6, subd. (c).) If there has been 'a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner.' (*Id.*, subd. (d)(2).) Additionally, the parties may stipulate that the petitioner is eligible for resentencing. (*Ibid.*) Otherwise, the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3).) 'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (*Ibid.*) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' (*Ibid.*)" (*Strong*, *supra*, 13 Cal.5th at p. 709.)

At the evidentiary hearing, the parties may rely on the evidence previously admitted at trial and may also offer "new or additional evidence." (§ 1172.6, subd. (d)(3).)

We now turn to defendants' contentions.

B.     *Whether the Trial Court Was Allowed to Apply the Current First Degree Felony Murder Rule of Section 189, Subdivision (e), to Defendants, Whose Convictions Are for Second Degree Murder*

Johnson's first contention, which Thornton joins, is that when a petitioner stands convicted of *second degree* murder under prior law, the trial court is barred from denying relief based on a finding beyond a reasonable doubt that the petitioner is currently guilty of *first degree* felony murder under the law as amended by S.B. 1437. Johnson asserts his claim is based on the language of former section 1170.95, subdivision (a)(3) and constitutional considerations.

1.     <u>Statutory Language</u>

At the time defendants petitioned for resentencing, section 1170.95, subdivision (a), provided: "A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply:

"(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine.

"(2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder.

(3) *The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019*." (Former § 1170.95, subd. (a), as added by Stats. 2018, ch. 1015, § 4, italics added.)

22

2.    Analysis

Johnson concedes that former section 1170.95, subdivision (a)(3) (former § 1170.95(a)(3)) *could* be interpreted to mean a petitioner convicted of murder under prior law is entitled to resentencing if he could not now be convicted of murder under the law as amended by S.B. 1437. That is how the parties and the trial court interpreted the provision, and the trial court determined defendants were not entitled to relief in this case based on its findings that defendants are currently guilty of first degree felony murder under section 189, subdivision (e)(3) (§ 189(e)(3)) as made effective January 1, 2019, by S.B. 1437.

This understanding of the resentencing procedure was endorsed in *People v. Hernandez* (2021) 60 Cal.App.5th 94. Like Johnson, the defendant in *Hernandez* argued that, because his conviction was for second degree murder, he could not be denied resentencing based on a finding he is now guilty of first degree murder. (*Id.* at p. 109.) The Court of Appeal rejected this argument, explaining that a "petition under section 1170.95 'express[es] the hypothetical situation' of 'what would happen today if [the petitioner] were tried under the new provisions of the Penal Code?'" (*Id.* at p. 110.) The defendant's prior conviction was "not relevant to the analysis." (*Ibid.*)

Johnson believes this understanding of the resentencing procedure is wrong. He argues former section 1170.95(a)(3) means the trial court must apply the current state of the law to the "trial or plea . . . that produced the *previous* judgment" and whether a petitioner's judgment is for first or second degree murder is "determinative of the boundaries within which the [section] 1170.95 analysis must occur." Johnson asserts, "Some cases will come before the court as second-degree judgments in which only section 188(a)(3) is at issue; some will come before the court as first-degree judgments where only

23

[section] 189(e)(3) is the issue; and some will come before the court as first-degree judgments where both [sections] 188(a)(3) and 189(e)(4) [*sic*] may apply."

As we understand his argument, Johnson thinks the phrase, "The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019" should be read to mean, "The petitioner who has been convicted of first degree murder could not be convicted of first degree murder because of changes to Section 189 (and possibly Section 188) made effective January 1, 2019, or the petitioner who has been convicted of second degree murder could not be convicted of second degree murder because of changes to Section 188 made effective January 1, 2019." Johnson offers no relevant authority to support his position, and we do not believe this is a reasonable reading of the phrase within the context of the statute.

" 'The first principle of statutory construction requires us to interpret the words of the statute themselves, giving them their ordinary meaning, and reading them in the context of the statute . . . as a whole. . . . 'In construing constitutional and statutory provisions, whether enacted by the Legislature or by initiative, the intent of the enacting body is the paramount consideration.' " (*People v. Gonzales* (2017) 2 Cal.5th 858, 868.)

Here, the Legislature has indicated its intent by its amendment to the statute. Senate Bill No. 775 (2021-2022 Reg. Sess.) amended section 1170.95(a)(3) to read, "The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (Stats. 2021, ch. 551, § 2; see § 1172.6, subd. (a)(3).) This amendment clarifies that the trial court's task at the evidentiary hearing is to determine whether the petitioner is currently guilty of murder

24

under the law as amended by S.B. 1437. The amendment demonstrates the Legislature's reasonable intent that, even if a petitioner was originally prosecuted under a theory of murder liability that S.B. 1437 eliminated, the petitioner is not entitled to have his or her murder conviction vacated if the petitioner is still guilty of murder under current law. (See also § 1172.6, subd. (d)(3) ["At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019"].) The *degree* of the petitioner's murder conviction is not mentioned at all. Given the Legislature's clarification of the provision, we reject Johnson's convoluted and strained interpretation of former section 1170.95(a)(3). (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 ["A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment"].)

We are unpersuaded by Johnson's suggestion that allowing the trial court to consider whether defendants are guilty of first degree felony murder under current law would raise serious constitutional problems. He asserts that his reading of the statute respects the "Sixth Amendment right to have a *jury* finding of guilt beyond a reasonable doubt" because the trial court at the evidentiary hearing is bound by "what the trial jury had actually found originally." The resentencing procedure under S.B. 1437, however, "is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights." (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 (*Anthony*).)

25

We do not mean to imply that a jury's prior factual findings in the petitioner's criminal trial may be ignored by a trial court deciding a petition under S.B 1437. (See *Cooper*, *supra*, 77 Cal.App.5th at pp. 416–417 [where a petitioner was acquitted of a crime, the trial court deciding a petition under S.B. 1437 could not, based on the trial record alone, find the petitioner committed that crime and then rely on that fact to find the petitioner currently guilty of murder].) But, in this case, no jury ever made a factual finding that Johnson or Thornton was not guilty of first degree felony murder, and this court never held the jury's first degree murder verdicts were unsupported by the trial evidence. We reversed the jury's first degree murder convictions only because of instructional error, and the prosecution elected to accept second degree murder convictions. Defendants' second degree murder convictions do not represent any factual findings by the jury that would prevent the trial court from now determining the defendants are currently guilty of first degree felony murder. Further, a trial court's finding that a petitioner is currently guilty of murder under the law as amended by S.B. 1437 would never result in a new conviction or greater sentence; it would mean only that the petition for resentencing would be denied. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 588 ["A petition under former section 1170.95 is not a criminal prosecution. . . . The process . . . can only help the defendant and can never hurt"].) In short, Johnson's "constitutional" argument fails.

C. *Sufficiency of the Evidence*

Johnson and Thornton argue there is insufficient evidence to support the trial court's findings that they are currently guilty of first degree felony murder under section 189(e)(3). Each defendant challenges the trial court's finding of reckless indifference to human life. Thornton also argues no

26

substantial evidence shows he was a major participant in the underlying attempted armed robbery.

### 1.    Legal Principles and Standard of Review

The phrases "major participant" and "reckless indifference to human life" of section 189(e)(3) are from section 190.2, which took the phrases from United States Supreme Court cases addressing when capital punishment is permissible for felony murder.  (*Strong*, *supra*, 13 Cal.5th at p. 705.)  The California Supreme Court first provided guidance on the meaning of these phrases in *Banks*, *supra*, 61 Cal.4th 788, and expounded further in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and *In re Scoggins* (2020) 9 Cal.5th 667, 676. (*Scoggins*).)

In *Banks*, our high court examined two United States Supreme Court cases, *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*).  (*Banks*, *supra*, 61 Cal.4th at pp. 798–804.) The court explained that *Tison* and *Enmund* " 'place[d] conduct on a spectrum' of defendant culpability, 'with felony-murder participants eligible for death only when their involvement [was] substantial and they demonstrate[d] a reckless indifference to the *grave risk of death* created by their actions.' (*Banks*, at p. 794.)  [At] one end of the spectrum was the getaway driver the high court found constitutionally ineligible for death in *Enmund . . .* : a ' "minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." ' (*Banks*, at p. 800.)  Toward the other end of the spectrum were the [Tison brothers] found eligible for death in *Tison*, *supra,* 481 U.S. 137, who had broken convicted murderers out of jail, armed them, captured an innocent family, 'held [the family] at gunpoint while the two murderers deliberated whether the family should live or die, [and] then stood by while

27

all four members were shot.' (*Banks*, at p. 802.)" (*Strong*, *supra*, 13 Cal.5th at p. 705, italics added.)

In *Banks*, defendant Matthews acted a getaway driver for an armed robbery of a medical marijuana dispensary in 2008. (*Banks*, *supra*, 61 Cal.4th at pp. 795, 804–805.) Matthews dropped off his three confederates, including Leon Banks, near the dispensary and waited for them for about 45 minutes. His confederates, two armed with guns, entered the dispensary and began tying up employees and searching the premises. At some point, the dispensary security guard, who also was armed, attempted to resist the robbery. The security guard and Banks were seen struggling at the front door, shots were fired, and the security guard was killed. (*Id.* at p. 795.) The *Banks* court concluded that Matthews could not qualify as a "major participant" under section 190.2 as a matter of law, noting there was no evidence that Matthews procured the weapons and that, even though he and two of his confederates were gang members, there was no evidence they had "previously committed murder, attempted murder, or any other violent crime." (*Id.* at p. 805, 807.) The court explained that, to establish major participation, "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an *ordinary* felony murder such as [the getaway driver in a home robbery] Earl Enmund" (*id.* at p. 802, italics added) and "participation in an armed robbery, without more, does not involve 'engaging in criminal activities known to carry a grave risk of death' " (*id.* at p. 805). The court observed that the Tison brothers, for example, did not merely participate in "a garden-variety armed robbery, where death might be possible but not probable[; rather, they] . . . were substantially involved in a course of conduct that could be found to entail a likelihood of death." (*Id.* at p. 802.)

28

The California Supreme Court returned to these issues the following year in *Clark*, *supra*, 63 Cal.4th 522. "The defendant in that case planned and organized the robbery of a computer store. ([*Clark*,] at p. 536.) The defendant planned for the robbery to take place after the store closed, when there would be few people in the store, and to involve only one gun without any bullets in it. (*Id*. at pp. 621–622.) But an employee's mother unexpectedly entered the store during the robbery, and the defendant's accomplice shot her with a bullet he had loaded into the gun. (*Id*. at p. 537.) Soon after the shooting, the defendant fled the scene and abandoned his accomplice. (*Id*. at p. 620.) [Our high court] concluded that although the 'defendant had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death' (*id*. at p. 613), the record did not establish that he exhibited reckless indifference to human life (*id*. at p. 623)." (*Scoggins*, *supra*, 9 Cal.5th at p. 676.)

In *Scoggins*, defendant Scoggins planned an unarmed assault and robbery that resulted in death. (*Scoggins*, *supra*, 9 Cal.5th at p. 671.) After he was swindled out of $900 by the victim, Scoggins devised a plan for his two friends to " 'beat the shit' " out of the victim and get Scoggins's money back; Scoggins would not be present at the planned assault and robbery. (*Ibid*.) At the planned attack, however, one of his friends shot at the victim multiple times, killing him. (*Id*. at p. 672.) Our high court concluded the evidence did not show Scoggins exhibited reckless indifference to human life. (*Id*. at p. 676.)

Synthesizing United States and California Supreme Court authority, the *Scoggins* court explained: "Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' (*Tison*, *supra*, 481 U.S. at p. 157.) Examples include 'the person who

29

tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' (*Ibid*.) Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' (*Clark*, *supra*, 63 Cal.4th at p. 617.)

"Reckless indifference to human life has a subjective and an objective element. (*Clark*, *supra*, 63 Cal.4th at p. 617.) As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' (*Banks*, *supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).) 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. (*Banks*, at p. 808.) Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life. (*Ibid*.; see *Clark*, at p. 623.)

"We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life. Relevant

factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? (*Clark, supra,* 63 Cal.4th at pp. 618–623.) ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Scoggins, supra,* 9 Cal.5th at pp. 676–677.)

We review the trial court's factual findings for substantial evidence and its application of facts to the law de novo. (*Cooper, supra,* 77 Cal.App.5th at p. 412.)[3] "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is,

---

[3] Johnson argues that independent review is the appropriate standard because a resentencing petition under S.B. 1437 is akin to a habeas proceeding. He cites no authority for his position. In a petition for resentencing, the judge who originally sentenced the petitioner is to decide the petition unless that judge is unavailable (§ 1172.6, subd. (b)(1)); if the petitioner makes a prima facie showing, the parties are allowed to present new evidence at the hearing on the petition (*id.,* subd. (d)(3); and the trial court must decide whether the petitioner is guilty of murder under the law as amended by S.B. 1437 beyond a reasonable doubt (*ibid.*). Here, the judge who originally presided over the criminal trial and observed the witnesses' testimony has now made findings of fact based on the same trial evidence to decide defendants' petitions under S.B. 1437. Under these circumstances, we will apply the usual rule that findings of fact are reviewed for substantial evidence. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*) ["We review the trial judge's fact finding for substantial evidence"]; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 319 [an order applying the correct standard of proof is reviewed for substantial evidence].)

evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*Clements*, *supra*, 75 Cal.App.5th at p. 298.)

2. Johnson

Johnson challenges the trial court's finding that he acted with reckless indifference to human life. He argues there is no objective evidence of "the foreseeability of a grave risk to human life beyond the normal risk inherent in any armed robbery." Johnson points out he was not armed and did not use a weapon and he knew nothing about Schnebly, Crocker, or Thornton that would suggest any of them had a history of, or propensity for, violence.

The Attorney General responds that the following evidence shows Johnson acted with reckless indifference: he knew two of his confederates were armed with guns; "he drove a car—which is itself a lethal weapon—at a high rate of speed into a populated campsite"; he "contributed to the chaotic scene"; he was present for the shooting; he "took no steps to minimize the use of violence" and instead stayed by the car and yelled epithets at his wife; and he drove his confederates from the scene without rendering aid to the victims.

After carefully considering the evidence, we are not convinced the record can support a finding that Johnson acted with reckless indifference to human life. "[A]ny person who plans or participates in an armed robbery can be said to anticipate that lethal violence might be used, given that 'roughly 1 in 200 [armed robberies] results in death.' [Citation.] But that fact, without more, does not establish reckless indifference to human life." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) The additional circumstances cited by the Attorney General do not establish that Johnson knew the robbery he was undertaking with Schnebly, Crocker, and Thornton would be more dangerous than a "garden-variety armed robbery." (See *People v. Ramirez* (2021) 71

32

Cal.App.5th 970, 987 (*Ramirez*) ["Participation 'in a garden-variety armed robbery' where 'death might be possible but not probable' is insufficient"].)

Johnson's knowledge that two of his confederates had firearms is insufficient to show reckless indifference to human life. Two of Matthews's confederates were armed in *Banks* (*Banks*, *supra*, 61 Cal.4th at p. 795) and Enmund's two confederates were armed (*Enmund*, *supra*, 458 U.S. at p. 802, fn. 2 (dis. opn. of O'Connor, J., joined by Burger, C. J., Powell, J., and Rehnquist, J.).)

On the other hand, a defendant's knowledge that a confederate is likely to kill is significant to the reckless indifference analysis. (*Clark*, *supra*, 63 Cal.4th at p. 621.) In *Tison*, for example, the defendant "Tison brothers brought an arsenal of lethal weapons into the prison which they then handed over to *two convicted* [*murderers*], one of whom the brothers knew had killed a prison guard in the course of a previous escape attempt," and they "had *advance notice of the possibility that their father would shoot* the family because, in response to one of the victim's plea not to be killed, the father stated that he 'was thinking about it.' " (*Clark*, *supra*, 63 Cal.4th at p. 621, italics added, citing *Tison*, *supra*, 481 U.S. at pp. 151, 140.) There is no similar evidence here that Schnebly, Crocker, or Thornton had killed or committed violent crimes before. (See *Banks*, *supra*, 61 Cal.4th at p. 807 [no evidence that Matthews's confederates "previously committed murder, attempted murder, or any other violent crime"].) Instead, as in *Enmund* and *Banks*, it appears Crocker fired his gun in a spontaneous response to resistance from Haggett and Litteral. (See *Banks*, *supra*, 61 Cal.4th at p. 807 ["as in *Enmund*, Banks's killing of [the security guard] was apparently a spontaneous response to armed resistance from the victim"].)

33

The Attorney General does not explain how the facts that Johnson drove the car at a high rate of speed and "contributed to the chaotic scene" (presumably referring to Johnson's skidding into the campsite and then yelling at Cano) demonstrate that Johnson knew his confederates were likely to use lethal force during the robbery, and we do not see how these facts support such an inference.

Johnson was present at the scene of the shooting, which distinguishes him from the defendants in *Enmund*, *Banks*, *Clark*, and *Scoggins*. But presence alone does not establish reckless indifference. (See *Ramirez, supra*, 71 Cal.App.5th at p. 989 [the defendant's presence at the scene of the shooting did not establish reckless indifference where he would "not have had a meaningful opportunity to intervene"]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 (*Moore*) [the defendant's "presence during the robbery also does not support a finding of reckless indifference"].)

*Tison* illustrates how a defendant's presence at the scene of the killing is relevant. "The defendants in *Tison* were physically present during the entire sequence of events that resulted in the victims' deaths. (*Tison, supra*, 481 U.S. at p. 158.) The Tison brothers flagged down the car containing the victims, kidnapped and robbed them, guarded them while their father decided what to do, and eventually watched their father shoot the victims. (*Id.* at pp. 139–141.) During that time, the defendants *knew* that *their father was debating whether to kill* the victims and had *ample opportunity to restrain the crime and aid the victims.* (*Id.* at p. 140.) Because the defendants did neither, the high court reasoned, they exhibited reckless indifference to human life." (*Scoggins, supra*, 9 Cal.5th at p. 678, italics added.)

34

In contrast, in *Moore, supra,* defendant Moore stole a car with two confederates including Athain Russell. (68 Cal.App.5th at p. 440.) While Moore remained in the stolen car, Russell got out of the car, robbed a couple at gunpoint, and then, without provocation, shot one of the robbery victims, killing him. (*Id.* at pp. 440, 452.) The Court of Appeal concluded that Moore's presence at the scene of the shooting did not support a finding of reckless indifference because "he never left the car," and "was not 'close enough to exercise a restraining effect on the crime or' Russell." (*Id.* at p. 452.) The court also found, "The short duration of the robbery and the sudden and unprovoked nature of the shooting" supported its conclusion, relying on *Scoggins.* (*Moore,* at p. 452.)

In *Scoggins,* our high court observed Scoggins "lacked control over [his confederates'] actions once they arrived on the crime scene, especially given how quickly the shooting occurred. This distinguishes Scoggins from the Tison brothers, who were physically present at the scene where *a long sequence of events culminated in murder.*" (*Scoggins, supra,* 9 Cal.5th at p. 679, italics added.)

Here, there was no long sequence of events culminating in murder. Johnson remained by the car as the attempted robbery quickly led to a killing.[4] According to Haggett, he struggled with Crocker over Crocker's gun, and Crocker shot him while Crocker was on the ground. Crocker got up and

---

[4] A campground host working at the entrance of Bu-Shay campground on the day of the shooting testified a four-door sedan approached with four occupants; they said they were "just here to drop something of[f] and sped off." The host testified that, within two or three minutes, he heard three gunshots and called 911 and the park rangers. (Thornton and Johnson both confirmed that the campground host was told they were just going to drop something off.)

started running toward the car, then he turned back and shot toward Litteral. There is no evidence showing either that Johnson knew Crocker was contemplating killing anyone before Crocker started shooting or that Johnson had an opportunity to aid the victims before the shooting started or to restrain Crocker from shooting, especially given how quickly the shooting occurred. (*Scoggins*, *supra*, 9 Cal.5th at p. 679.) This case is more like *Scoggins* and *Moore* than *Tison*.

Finally, there is the fact Johnson "drove his confederates from the scene without rendering aid to the victims." Our high court has explained, "A defendant's actions after the shooting may also bear on the defendant's mental state. [Citation.] For example, the high court took into account the Tison brothers' failure to render aid to the victims after the shooting when it concluded that they acted with reckless indifference to human life. (*Tison*, *supra*, 481 U.S. at pp. 151–152.) But . . . when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state. In *Clark*, the defendant fled the scene and abandoned his accomplice immediately after the shooting. [Citation.] . . . [T]he defendant's actions could have suggested either that the defendant rejected his accomplice's actions in committing the shooting or that he wanted to flee the scene as quickly as possible to avoid arrest. [Citation.] Ultimately, we concluded that the '[d]efendant's absence from the scene of the killing and the ambiguous circumstances surrounding his hasty departure make it difficult to infer his frame of mind concerning [the victim's] death.' " (*Scoggins*, *supra*, 9 Cal.5th at pp. 679–680.) In *Scoggins*, the court concluded that the defendant's "behavior could suggest that he had not planned for his accomplices to kill [the victim]." (*Id*. at p. 680.)

That Johnson left with his confederates after the shooting does not unambiguously demonstrate that he was acting with reckless indifference when he participated in the attempted robbery. It is not disputed that Johnson was dropped off by the others in Ukiah. Johnson testified Schnebly and Crocker wanted to go to Lake County to "hide out" but he stayed in Ukiah because he "wasn't hiding from nobody." It could be inferred that Johnson separated from his confederates after the killing because he had not planned for them to kill and he did not agree with Crocker's actions in shooting Haggett and Litteral. (See *Scoggins*, *supra*, 9 Cal.5th at pp. 679–680.)

Having considered the evidence cited by the Attorney General, we conclude he has failed to demonstrate that substantial evidence supports a finding Johnson acted with reckless indifference.

The trial court's reasoning differs somewhat from the Attorney General's and is also unpersuasive. The court relied on Johnson's threats to his wife Cano and her companions in the days leading up to the attempted robbery and found, "[Johnson's] statements and conduct showed that his primary motivation was to take a group of men with him to the campsite, threaten, assault and steal from the campers and to instill fear in his wife." It determined Johnson "was clearly the instigator of the violent assault at the campground, and had knowledge his companions were armed." The court found Johnson's speeding into the campsite created "the atmosphere of fear and confrontation that he and his codefendants intended to create," and it noted that Johnson shouted, "see what we can do." But the trial court does not explain how Johnson's personal threats to Cano and Litteral show that he knew the attempted armed robbery he participated in "would involve a grave risk of death." (*Banks*, *supra*, 61 Cal.4th at p. 807.) To the extent the trial

37

court suggests that Johnson orchestrated an armed robbery selecting particularly violent confederates with the intent that one of them would kill Litteral, there is no evidence to support that inference.

The court also relied on the fact Johnson "testified that he knew there was going to be violence when they arrived." But we must keep in mind that the issue at trial was only whether Johnson intended to aid and abet an attempted robbery (or an attempted kidnapping) because, under then existing law, that finding alone would make him liable for murder. Thus, the prosecutor tried to show Johnson was not an unsuspecting driver as he claimed; rather he was a willing participant in a planned armed robbery. In the context of the law as it existed at the time of trial, it is clear the prosecutor elicited no more than an admission from Johnson that he realized even before they reached the campground that his companions intended to commit robbery using firearms.[5] Johnson, however, did *not* testify that he

---

[5] In cross-examination, Johnson admitted he told the police that, before they borrowed the car, he heard his companions say they were " 'going down to handle some business over at the lake, Mendo style.' " Johnson agreed with the prosecutor that "Mendo style" meant "taking what they want against their will." Johnson agreed he "knew they were going to *use some force*," but he "wasn't quite sure exactly what." (Italics added.)

The prosecutor asked, "So you know they plan to do it Mendo style. Which meant they were going to use *some kind of force or violence* or do something. You may not have known the method at that exact point in time, correct? But you knew they were *going to use force and violence*; isn't that correct?" Johnson responded, "Yes, it is, sir."

The prosecutor asked a few more questions intended to show Johnson knew his companions were planning to commit an armed robbery before they reached the campground. Johnson agreed he "heard something about guns" when they were at Crocker's place. Later, the prosecutor asked, ". . . you certainly knew that they were going to use *some kind of violence and maybe even have weapons* because you want to get [your wife] out of there safe,

knew his companions intended to use additional force or violence beyond what might be expected in a "garden-variety" armed robbery. (This is not surprising given that the prosecutor was not trying to prove Johnson acted with reckless indifference to human life.)

The trial court concluded, "Johnson's role in the offense is far more like the defendants in *Tison* that the defendant in *Banks*." This conclusion is not supported by the evidence, either. "The Tisons did not assist in a garden-variety armed robbery, where death might be possible but not probable, but were substantially involved in a course of conduct that could be found to entail a likelihood of death." (*Banks*, *supra*, 61 Cal.4th at p. 802.) The same cannot be said about the attempted robbery in this case that unfortunately led to Litteral's death.

In sum, Johnson did not supply the weapons, there is no evidence his confederates had killed before or had a propensity for violence, the entire incident happened quickly without an opportunity for Johnson to restrain the crime or aid the victims, and Crocker shot Litteral apparently in a spontaneous response to resistance from the intended robbery victims. Considering the totality of the circumstances, we conclude the trial record lacks substantial evidence supporting a finding that Johnson acted with

---

otherwise be nothing to keep her safe from; isn't that true, Mr. Johnson?" (Italics added.) Johnson answered that he "probably had suspicion" but did not know about the weapons until they pulled off the road and Thornton retrieved the duffel bag with the shotgun. This sequence of the prosecutor's questioning demonstrates that Johnson's agreement that he knew his companions were going to use "violence" meant he knew they intended to commit an armed robbery. But it cannot reasonably be inferred from Johnson's testimony that he knew or suspected his confederates intended to engage in violent conduct at the campsite beyond that inherent in any armed robbery.

reckless indifference to human life and, thus, he cannot be found guilty of felony murder under section 189(e)(3) as a matter of law. Accordingly, we reverse the order denying Johnson's petition for resentencing under S.B. 1437.

3.    Thornton

The trial court found the following facts regarding Thornton. "The presence of the purported cash or marijuana served as enticement for Thornton, Crocker and Schnebly to go with Johnson and participate in the robbery." "In his closing argument, the prosecutor stated that Thornton was 'there for the robbery . . . he carries a bat.' The evidence undeniably supported this statement." "The evidence also undeniably shows that Crocker and Schnebly were armed with firearms when the group arrived at the campground." "Thornton hit Haggett with the bat on the back of the head." Litteral "was struck with a blunt object like a bat or a bowling pin according to the coroner. The force of the blow broke his arm. Several witnesses testified that the only person using a bat as a weapon was Simon Thornton[.]" "In sum, Simon Thornton decided to join three others in committing an armed robbery. He was armed with [a] bat while two others were armed with firearms. He participated in trying to take property by force or fear and in so doing managed to protect his co-participants by using the bat on Haggett and Litteral. The prosecution proved beyond a reasonable doubt that Thornton was protecting Crocker when he struck Haggett in the head with the bat. This enabled Crocker to escape with his gun and within moments Crocker shot and killed Joe Litteral[]. Simon Thornton undeniably facilitated the murder of Joe Litteral[]." "Thornton's culpable state of mind was further demonstrated by the threats to co-defendant Johnson after the

40

two were arrested and phone calls to his fiancé[e] asking her to assist in hiding the weapons."

The trial court concluded that its factual findings demonstrate Thornton was a major participant and acted with reckless indifference to human life and therefore denied the petition.

The facts that Thornton participated in an attempted robbery involving marijuana and that two of his confederates were armed with firearms do not establish reckless indifference to human life. (See *Banks*, *supra*, 61 Cal.4th at pp. 795, 804–805, 811 [Matthews's participation in a robbery of a medical marijuana dispensary where two of his confederates were armed did not support findings of major participation and reckless indifference to human life].)

Next, there are the facts Thornton was armed with, and used, a bat. Thornton does not challenge the court's finding that he used a bat on Haggett, but he argues it was pure speculation for the court to infer from his conduct that he "intended, or would have anticipated, that [his] use of the bat would result in Mr. Crocker shooting Mr. Haggett." The evidence of Thornton's direct involvement in a physical fight with the victims and the circumstances of the shooting are as follows.

Johnson testified that Schnebly told Thornton to help Crocker after Haggett started hitting Crocker. According to Johnson, Thornton then got out of the car with the bat and started swinging at Haggett. Haggett testified he was struggling with Crocker when he felt "severe blows to the back of [his] head." In response, Haggett "recoiled [his] fist to go hit" Thornton,[6] but

---

[6] Thornton points out that Haggett did not sustain any head injury from the blows. The trauma surgeon who treated Haggett examined his head and noted no injuries.

Crocker shot him. Johnson testified that Litteral ran up and hit Crocker with a stick or log. Haggett testified that, after he was shot, he saw Litteral fighting with Thornton. At that point, Crocker "had gotten up to his feet and had . . . started running towards the car." Haggett saw Crocker "turn back around and start firing in [Litteral]'s direction." Crocker was at the car when he shot Litteral, and Thornton "was halfway to the car."

Does this evidence show Thornton "knew his own actions would involve a grave risk of death" (*Banks*, *supra*, 61 Cal.4th at p. 807) or "a willingness to kill (or to assist another in killing) to achieve a distinct aim" (*Clark, supra,* 63 Cal.4th at p. 617) such that he is eligible for the death penalty? (*Strong*, *supra*, 13 Cal.5th at p. 703 [whether a defendant may be sentenced to death or life without the possibility of parole determines eligibility for sentencing relief under S.B. 1437].) We think the answer must be no. At the time Schnebly told him to help Crocker, Thornton would have realized that the robbery was not going as planned because the intended victims were fighting back, but he also would have seen that Crocker and Schnebly, though armed with firearms, were not firing their weapons. Under these circumstances, Thornton would have had no reason to know Crocker "was likely to use lethal force" when he joined the affray. (*Scoggins*, *supra*, 9 Cal.5th at p. 681 ["A defendant's knowledge of a confederate's likelihood of using lethal force, which may be evident before or during the felony, is significant to the analysis of the defendant's mental state"].) Crocker had already returned to the car and Thornton was running toward the car when Crocker turned around and shot Litteral. This shows Thornton was retreating and would have thought Crocker had withdrawn from the attempted robbery by the time the killing occurred. As we observed in Johnson's case, the events at the campsite unfolded rapidly, and the short duration of the offense "does not

42

weigh in favor of finding that [Thornton] exhibited reckless indifference to human life." (*Id*. at p. 681.)

The trial court also relied on its findings that Thornton threatened Johnson after they both had been arrested and that he telephoned someone from jail seeking assistance in hiding weapons. This evidence may suggest consciousness of guilt; after all, the evidence does support that Thornton intended to aid an armed robbery, and under the felony murder law as it existed then, this would mean he was also liable for Litteral's death. But Thornton's jail phone call and threat to Johnson do not unambiguously suggest he had the requisite personal culpability required to find reckless indifference to human life. Stated differently, Thornton's post-arrest conduct does not demonstrate that, when he participated in the attempted robbery, he knowingly created a grave risk of death.

There is no evidence Thornton was the instigator or prominent planner of the robbery, he did not supply the firearms, and the attempted robbery and shooting happened quickly with Crocker shooting apparently in a spontaneous response to resistance from the victims. Most significantly, there is no evidence Thornton had any reason to believe his confederates were likely to kill when he joined the physical fight between Crocker and Haggett. Considering the totality of the circumstances, we conclude the trial record lacks substantial evidence supporting a finding that Thornton acted with reckless indifference to human life.[7] We therefore reverse the order denying Johnson's petition for resentencing under S.B. 1437.

---

[7] Because there is no substantial evidence of reckless indifference, we need not decide whether Thornton was a major participant in the underlying attempted robbery. (*Clark, supra*, 63 Cal.4th at p. 611.)

43

D.    *Remaining Contentions*

    1.    <u>Sixth Amendment</u>

Johnson argues he is entitled under the Sixth Amendment to a jury trial on whether he is now guilty of first degree felony murder under section 189(e)(3) because this theory was never presented to the jury in his original criminal trial.  Thornton joins the claim.  We rejected this argument in *Anthony*, *supra*, 32 Cal.App.5th at page 1156.  Our position is "the unanimous view of the several courts that have considered the question" (*People v. James* (2021) 63 Cal.App.5th 604, 606), and defendants have not persuaded us to change our view.

    2.    <u>Attempted Murder Convictions</u>

Finally, Johnson asserts attempted murder is subject to review under S.B. 1437.[8]  At the time defendants filed their petitions, former section 1170.95 applied to persons "convicted of felony murder or murder under a natural and probable consequences theory" (former § 1170.95, subd. (a), as added by Stats. 2018, ch. 1015, § 4), and the statute did not mention those convicted of attempted murder.  Since then, section 1170.95 was amended to include persons convicted of "attempted murder under the natural and probable consequences doctrine."  (Stats. 2021, ch. 551, § 2; see *People v. Porter* (2022) 73 Cal.App.5th 644, 651–652 ["section 1170.95 has since been amended to '[c]larif[y] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories' "].)

---

[8] Again, Thornton joins the claim.

Section 1172.6 (see fn. 2, above) now provides, "A *person convicted of* felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, *attempted murder under the natural and probable consequences doctrine*, or manslaughter *may file a petition* with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts . . . ." (§ 1172.6, subd. (a), italics added.)

Defendants in this case, however, did not argue below that their convictions for attempted murder should be vacated under S.B. 1437. Defendants are, of course, free to petition for relief under the current law.

## DISPOSITION

The orders denying defendants' petitions for resentencing are reversed. The trial court is directed to vacate defendants' murder convictions and resentence them in accordance with section 1172.6.

45

_____

Miller, J.

WE CONCUR:

_____

Richman, Acting P.J.

_____

Stewart, J.

A160581, *People v. Johnson*; A160566, *People v. Thornton*

46